opened September 29, 1895, and closed February 15, 1898. He had also what appears to be his business account in the Seventh National Bank, opened October, 1894, and closed February 15, 1898. It further appears that since the date of the bill of sale Alice Dolon, besides adding $80 to the Greenwich Savings Bank account on July 9, 1898, opened another account in the Bank for Savings on July 10, 1899, and also opened an account in the Seventh National Bank, above mentioned, on the 14th of February, 1898, which accounts are all still open. It thus appears that at about the date of the bill of sale all the bank accounts of the bankrupt were closed, and that then or soon thereafter accounts in the name of Alice Dolon were opened.

Furthermore, it appeared by the schedules, which disclosed only six creditors, that none of the claims are in favor of business creditors, existing prior to February 14, 1898, except probably the claim of the opposing creditor, John Boyle.

Under these circumstances, it is impossible to believe that bad business or business debts induced the bankrupt to make an assignment, and the testimony points somewhat directly to the transfer for a trifling consideration of a fairly good business, and a continuation of the same interests under different names. There appears to have been a transfer of the entire business, and that not a bad one, for no sufficient reason, and for no sufficient consideration.

Whether the transfer was made to avoid the payment of increased alimony or not is not important, if in fact the bankrupt thereby attempted to conceal his property from creditors. It is claimed by the counsel for the bankrupt that as the creditor Boyle was no creditor at the time of the transfer, and has since, although suspecting the nature of the transaction, continued to deal with the bankrupt's successor in business, he is not in a position to set aside the transfer, but the question here is not, what this creditor is in a position to do, but whether the facts are such as to justify any action on the part of the trustee to recover these moneys for the creditors generally. It is also suggested that, if there were a secret trust, it was of such a nature that the bankrupt himself could not enforce it against the will of the transferee, Alice Dolon. While this may be true as regards the bankrupt, it may not be true as regards the trustee in bankruptcy.

Upon all the testimony and proceedings in this matter, I am unable to avoid the conclusion that the transfer to Alice Dolon was not a bona fide transaction, and that practically the business has continued to be managed by and for the interest of the bankrupt, and whether or not it may be possible for the trustee to set aside the transaction on the ground of the secret trust, and recover assets to the estate, the testimony does not, in my opinion, present a case in which a discharge should be granted.

I am therefore of the opinion that the bankrupt's discharge should be denied.

Franklin Bien, for petitioner.

BROWN, District Judge. Upon the evidence in the above case a jury would, in my judgment, find without hesitation that the transfer to Dolon was a mere subterfuge and sham, and that the business was in effect all the time the business of the bankrupt, as before, carried on upon a secret trust for his benefit, and hence a concealment of assets from the trustee which should bar the bankrupt's discharge.

---

In re ROLLINS GOLD & SILVER MIN. CO.

(District Court, S. D. New York. July 12, 1900.)

1. BANKRUPTCY—INVOLUNTARY PROCEEDINGS—MINING CORPORATION NOT WITHIN ACT.

A corporation organized for the purpose of "mining and reducing gold, silver, and other ores, and selling the same," and whose property consists of 26 mining claims, with the necessary machinery and appurtenances, about 1,200 acres of agricultural lands, and 300 or 400 acres of placer min-

ing property, nearly all of which it has leased for eight years past, and has done nothing save receive the royalties or rent to which it is entitled under the lease, is not within Bankr. Act 1898, § 4b, providing that "any corporation engaged principally in manufacturing" may be adjudged an involuntary bankrupt.

2. SAME—ADMISSION OF INSOLVENCY BY DIRECTORS OF CORPORATION.

An admission of inability to pay debts, and willingness to be adjudged a bankrupt on that ground, which is constituted an act of bankruptcy under Bankr. Act, § 3, is within the authority of the directors of a corporation, and is not a corporate function to be exercised by the whole body of corporate members.

3. SAME—CORPORATIONS—DIRECTORS AS CREDITORS.

Creditors of a corporation, who happen also to be stockholders and directors in the company, are not precluded by reason of such relation from commencing proceedings in involuntary bankruptcy against the corporation.

In Bankruptcy.

The following is the opinion of Referee F. K. PENDLETON:

An order to show cause having been made why the order adjudicating the above company a bankrupt should not be set aside and the petition and proceedings thereunder dismissed, the matter was referred to me by an order entered on the 6th day of February, 1900, to take the testimony and proofs in regard thereto and to report the same, together with my opinion thereon, with all convenient speed.

The grounds of the application are:

(1) That the Rollins Gold & Silver Mining Company was not a corporation engaged principally in the business of manufacturing, trading, etc., as required by section 4 of the bankruptcy act, and not therefore subject to the provisions of that act.

(2) That no act of bankruptcy was committed by the said company, in that the board of directors of a corporation has not the power to make the statutory admission required by section 3 of the act, of the inability of the company to pay its debts and its willingness to be adjudged a bankrupt, the power to do so being vested in the stockholders exclusively.

(3) That the corporation was adjudged a bankrupt as the result of a scheme on the part of the president of the company and his associates in the board of directors, whereby the company has practically obtained the benefits of the act as a voluntary bankrupt.

(4) That the corporation was not at the time of the filing of the petition for the adjudication herein, unable to pay its debts.

The first question involved is whether the above company is one of the corporations made by section 4, subd. "b," of the bankruptcy act, amenable to its provisions. That section provides that "any corporation engaged principally in manufacturing, trading, printing, publishing or mercantile pursuits" may be adjudged an involuntary bankrupt.

This corporation was organized under the laws of the state of New York, entitled "An act to authorize the formation of corporations for manufacturing, mining, mechanical and chemical purposes," passed February 17, 1848. The objects for which the corporation was formed were stated in the certificate or articles of incorporation to be "the mining and reducing of gold, silver and other ores and selling the same."

In the New York & Westchester Water Co. Case (D. C.) 98 Fed. 711, it was held that the question as to whether a corporation is included within the meaning of section 4, subd. "b," or not, depends not on the extent of its powers, but on its pursuits,—not whether it has the power, under its articles of incorporation, but whether it in fact is engaged in one of the occupations there mentioned, and that the words of the act, "manufacturing, trading," etc., should be interpreted according to their commonly accepted meaning. It has been decided that selling the product of one's own land is not "trading or mercantile pursuit."

Under the present act it has been held that mining is not a manufacturing, trading or mercantile pursuit. In re Elk Park Mining & Milling Co. (D.

C.) decided by Judge Halleck. The case seems not to be reported, but the copy of the opinion submitted to me is filed herewith.[1] It appears from the public press in the last few days that a similar decision was rendered by Judge Carland, of the United States circuit court for the state of Missouri, in the Victoria Zinc-Min. Co. Case (oral opinion). I think these decisions clearly correct. It was held in Byers v. Coal Co., 106 Mass. 131, that a mining company is not a manufacturing company within the meaning of the statute imposing upon officers and stockholders of manufacturing companies liability for debts. In another case that a company mining coal is not a manufacturing company within the meaning of the act releasing manufacturing companies from taxation. Appeal of Commonwealth (Pa. Sup.) 18 Atl. 133. The above is conceded by counsel for petitioning creditors, at whose instance this company was declared a bankrupt. But it is contended that reducing or milling ore is manufacturing within the meaning of the act.

The question is therefore whether the Rollins Gold & Silver Mining Company was principally engaged in milling and reducing ore, and if so whether that business is manufacturing.

It appears from the evidence that the property of the corporation was situated in Colorado, and consisted of 26 mines or mining claims, with the necessary machinery and appurtenances, a stamp mill which cost about $25,000, some 1,200 acres of agricultural lands, and 300 or 400 acres of placer mining property; that the company had leased for almost the whole of the last eight years all its property, and has done nothing except receive the royalties or rent that it became entitled to under the lease. The mining of ore has been carried on by the lessee or his sublessees, the lessee operating the mill to grind ores so mined, and perhaps for other miners. So far as milling ores for others is concerned, that is not manufacturing, but rather rendering or performing labor or services for hire.

I think, however, it very clear that the business carried on by the lessee cannot in any sense be held to be the business of the lessor, and that on the above facts the company is not principally or at all engaged in milling and reducing ore. But even if it were, I do not think that milling and reducing ore come within the meaning of the word "manufacturing" as used in the act. It is certainly not within the commonly accepted meaning of the word, nor do I think it within its technical meaning.

The words "manufacture" and "manufacturing" have been defined frequently. "Manufacture" has been described as anything made or manufactured by hand or manual dexterity or by machinery. To form by manufacture or workmanship, by the hand or by machinery, to make by art and labor. To manufacture has been said to be "to make or fabricate from raw material by hand, by art or by machinery and work into convenient forms for use."

In Carlin v. Assurance Co., 57 Md. 515, it was held that a flour mill operated by steam, with a middling purifier and bran duster, belting and other machinery, was a manufacturing establishment, as the word was used in a policy of insurance. Charcoal produced by burning bone and bone dust by pulverizing bone have been held manufactures of bone within the meaning of the revenue act. Schriefer v. Wood, 5 Blatchf. 215, Fed. Cas. No. 12,481.

In Hawes v. Petroleum Co., 101 Mass. 385, it was held that a company, among the purposes of which as stated in its articles of incorporation was "refining oil coal and other minerals," was within the provisions of an act to define and regulate the enforcement of the liabilities of officers and stockholders of manufacturing corporations. In all these cases a practically new article was produced or created. The Massachusetts court held in another case that cutting natural ice and storing it was not manufacturing. Hittinger v. Inhabitants of Westford, 135 Mass. 258.

Brande's Encyclopædia defines "manufacture" as a term employed to designate the change or modification made by art or industry in the form or substance of material articles in the view of rendering them capable of satisfying some desire or want of man; and manufacturing industry to consist in the application of art, science or labor to bring about certain modifications or changes of already existing materials. He includes under the term "manufac-

---

[1] Now reported in 101 Fed. 422.

ture" all branches of industry, with the exception of fishing, hunting, mining and such industries as have for their object to obtain possession of material products in the state in which they are fashioned by nature. He says that the term is generally applied to those departments of industry in which the raw material is fashioned into desirable articles by art or labor without the aid of the soil, but that there is no real good reason for such limitation, and that it is obvious from the slightest consideration that agriculture is nothing but a manufacture, for the business of the agriculturist is so to dispose of the soil, seed, manure or other materials, that they may supply him with other and more desirable products.

This definition is certainly going very much further than the ordinary acceptation of the term, but even in this view the industries excepted are "fishing, hunting, and mining and such industries as have for their object to obtain possession of material products in the state in which they are fashioned by nature," which would include the industry of milling and reducing ore. Mining and milling would seem to be, taken together, one industry, having for its object "to obtain possession of material products in the state in which they were fashioned by nature." Mining, the process of extracting from the earth the rough ore, would seem to be the first step in the process, milling or reducing the second step, to wit: the further separating of the materials found together, the one from the other, and extracting from the mass the particular natural product desired.

I think, therefore, the application should be granted on the first ground.

As to the second ground, it would seem to be disposed of in this district by the case of In re Marine Machine & Conveyor Co. (D. C.) 91 Fed. 630. It seems to me very clear that the admission is entirely within the authority of directors of a corporation charged with the management of its affairs, and is not a corporate function to be exercised only by the whole body of corporate members. The provisions as to dissolution of corporations are statutory, and are based on the lawmaking power's conception of expediency, and do not, it seems to me, have any bearing on the present question.

As to the third ground: Congress, the lawmaking power, prohibited corporations availing themselves of the provisions of the act, but allowed creditors of certain corporations to make them involuntary bankrupts.

There is no limitation on the word "creditors," which could exclude creditors who were at the same time directors, officers or employés. In fact section 59, subd. "e," of the act, which provides that employés or relations shall not be counted among creditors in computing the number who must join in involuntary proceedings, limits the exclusion to those who have not joined in the petition, clearly indicating that they may act as petitioning creditors. I do not think there is any reason to suppose congress intended to make any discrimination against directors, officers or stockholders.

The present proceedings were brought by three creditors, two of them were assignees of debts due officers or directors of the company, and it is contended that the proceedings are brought with the connivance of the officers of the company and for some purposes of their own. There is no proof that these particular claims were not valid debts of the company, but the contention is that they were assigned without consideration and for the purpose of bringing these proceedings.

I do not think the question of the jurisdiction of the court depends in any way on the objects and purposes of the creditors in bringing the proceedings or that they acted with the knowledge and consent of officers and directors of the company. Assuming the jurisdictional facts to exist, the creditors may be directors or stockholders of the company, and in one sense their action in bringing involuntary proceedings against the company would be to allow the company to avail itself of the benefits of the act, but I do not think this alone any objection or that it is prohibited by the statute. The act does not allow corporations to go into voluntary bankruptcy, but it does not seem to me that that should preclude creditors who happen to also be stockholders or directors of the company from exercising the rights of creditors to bring involuntary proceedings if facts of insolvency, etc., exist.

As to the fourth ground: There was some evidence to show that the company's property was worth the amount of its debts, but it was under lease and

not in the possession of the company, and although the evidence is not very full, the fair inference from it is that the company was not in funds to pay its current debts. The question of its financial condition was not very fully gone into in the testimony, principal reliance being placed by counsel on the other grounds, and, in the view I have taken, it seems unnecessary to pursue this point further.

The application should be granted on the first ground, all of which is respectfully reported.

H. F. Andrews, for petitioner.

BROWN, District Judge. Upon the above findings, the proceedings are dismissed upon the first ground above stated.

---

### In re HORTON.

(Circuit Court of Appeals, Eighth Circuit. June 4, 1900.)

#### No. 18.

BANKRUPTCY—INTEREST OF TRUSTEE IN LITIGATION IN STATE COURT—INJUNCTION.

Where, four months prior to being adjudicated a bankrupt, a debtor sold certain buildings, under an agreement with the vendee that if any liens were established against the property the latter might discharge the same out of part of the purchase price retained by him, and thereafter mechanics' liens were filed against the buildings, and suits brought to enforce the same in a state court, after proceedings in bankruptcy had been instituted against the vendor, the trustee of the bankrupt is not entitled to have the suits for the enforcement of the liens against the buildings enjoined, and the proceedings removed to the bankrupt court.

Petition for Revision of Order of the District Court of the United States for the District of Nebraska, in Bankruptcy.

T. J. Mahoney, for petitioner.

Myron L. Learned and Henry E. Maxwell (J. W. Hamilton and John L. Kennedy, on the brief), for respondent.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. This is a petition filed under section 24 of the recent bankrupt act, to revise in matter of law an order made by the district court of the United States for the district of Nebraska in a bankruptcy proceeding. The bankrupt, the Greater America Exposition, a corporation, was adjudicated a bankrupt on January 5, 1900. Theretofore, on September 7, 1899, it had conveyed certain buildings which belonged to it to the Chicago House-Wrecking Company. A part of the consideration for the purchase was paid by the wrecking company in cash. The balance of the purchase price was retained by it upon an understanding or agreement, in substance, that, if any liens were established against the property sold, the wrecking company might discharge the same out of the proceeds of the sale which remained unpaid. Subsequently, in the months of October and November, various persons filed mechanics' liens against the buildings, and in due time brought suits against the wrecking company and